JOYCE M. SWEETING, as Administratrix of the Estate of GROVER C. SWEETING, Deceased, Respondent, v BOARD OF COOPERATIVE EDUCATIONAL SERVICES et al., Defendants, and PEARSON ELECTRIC COMPANY, INC., Appellant.

PEARSON ELECTRIC COMPANY, INC., Third-Party Plaintiff-Appellant, and BALLARD ASSOCIATES et al., Third-Party Plaintiffs-Respondents, v TRUAX & HOVEY DRYWALL CORPORATION, Third-Party Defendant-Respondent.

Fourth Department, October 30, 1981

**APPEARANCES OF COUNSEL**

*Hancock, Estabrook, Ryan, Shove & Hust (Robert Duell* of counsel), for Pearson Electric Company, Inc., appellant.

*Mackenzie, Smith, Lewis, Mitchell & Hughes (Arthur Chalenski* of counsel), for Ballard Associates, third-party plaintiff-respondent.

*Bucci & Lockwood (William F. Lynn* of counsel), for Joyce M. Sweeting, respondent.

*Bond, Schoeneck & King (S. Paul Battaglia* of counsel), for Lennox Industries, Inc., third-party plaintiff-respondent.

*Sugarman, Wallace, Manheim & Schoenwald (George DeMore* of counsel), for Richard Hoyt, Inc., third-party plaintiff-respondent.

*Coulter, Fraser, Ames, Bolton, Bird & Ventre (Robert Coulter* of counsel), for Board of Cooperative Educational Services, defendant.

*Hiscock, Lee, Rogers, Henley & Barclay (Taylor Obold* of counsel), for Truax & Hovey Drywall Corporation, third-party defendant-respondent.

### OPINION OF THE COURT

*Per Curiam.*

Early in the afternoon of July 17, 1975 plaintiff's intestate, Grover C. Sweeting, and a co-worker employed by defendant Truax & Hovey Drywall Corporation with the aid of their foreman, erected a scaffold on a mezzanine above the main floor of a B.O.C.E.S. building located on Thompson Road in Syracuse. They then proceeded to mount sheetrock onto metal studs on the rear wall of the mezzanine using a screwgun. A little while later, as the intestate descended from the scaffold to take a coffee break, he stepped on a double strand of wire which was affixed to the top of the kneewall with a bent nail. The wires shorted out and burned a hole in Sweeting's heavy rubber-soled work boot. Tulip, a foreman for defendant Pearson Electric Company, the electrical subcontractor, was summoned by the job superintendent for defendant Richard Hoyt, Inc., the general contractor on the project.

According to Tulip there were wires on top of the kneewall which had shorted out and charred because their insulation was broken or worn away. He testified that the defective wires were a loop which ran from an adjoining panel room up to the mezzanine and back down to feed a panel room light. He stated that he removed the defective loop, but neither inspected nor intentionally moved the two double strings of wire feeding temporary lights which remained on the mezzanine. When he had finished his repairs, he and the job superintendent told the two sheetrockers that the problem had been corrected, but warned them that the wires on the mezzanine were carrying voltage. Sweeting and his co-worker then returned to work

with Sweeting on top of the scaffold and his co-worker below. At approximately 3 P.M., the co-worker heard Sweeting groan and then saw him collapse as sparks flew from the base of the scaffold. He called for help, but Sweeting was dead, having suffered cardiac arrest from electrocution.

Grover Sweeting's widow, Joyce M. Sweeting, commenced this wrongful death action as administratrix of his estate against Pearson Electric Company (Pearson); Richard Hoyt (Hoyt); Lennox Industries, Inc. (Lennox); owner of the title to the B.O.C.E.S. building; B.O.C.E.S., which was the sole tenant of the building; and Ballard Associates (Ballard), a partnership, which, on January 20, 1975, had entered into a contract with Lennox to purchase the B.O.C.E.S. building. Ballard had leased the premises to B.O.C.E.S. for a term commencing September 1, 1975, and as a condition of the lease, agreed to undertake the renovation of the building, engaging Hoyt as general contractor to perform the work. Legal title did not pass to Ballard until September 25, 1975, two months after the accident. Each of the above-named defendants subsequently impleaded Sweeting's employer, Truax & Hovey Drywall Corporation (Truax & Hovey), and cross-claimed against each other.

The trial court interpreted plaintiff's complaint as stating a claim against Pearson and Hoyt for negligence in failing to provide a reasonably safe place to work in violation of the common-law duty codified in section 200 of the Labor Law. The third-party complaints were similarly interpreted as alleging a breach of this duty by Truax & Hovey. Although the complaint made no reference to any specific statutory section, it was also interpreted to allege a violation of the statutory duty "to provide reasonable and adequate protection and safety" to construction workers, which is imposed upon owners, general contractors and their agents by subdivision 6 of section 241 of the Labor Law. In fact, in its charge and interrogatories, the trial court instructed the jury to determine which of the three defendants — Ballard, Lennox or B.O.C.E.S. — had exercised dominion or control over the workplace and hence were "owners" within the meaning of section 241 of the Labor Law.

At trial, Richard Tulip, a foreman; his superior, David Babbitt, general foreman for Pearson; and William Wood, job superintendent of Hoyt, each testified that they inspected the accident scene immediately after Sweeting's body was removed. Tulip testified that he observed a nick and a burn mark on a lower cross brace of the scaffold and a broken wire lying on the floor. Babbitt testified that a feeder wire was running through the scaffold and was fused to a lower cross brace at the burn mark until he and Tulip touched the wire and it fell to the floor. Wood testified that he did not inspect the wiring, but did check the screwgun, which he found to be properly grounded. This was corroborated by Babbitt, who stated that he tested the screwgun with a ohmmeter and found it to have ground integrity. Based upon these facts, plaintiff's expert witness, Dr. Howard Card, a professor of electrical engineering, expressed his opinion that the scaffold had become energized by a wire in contact with the lower angle iron or cross brace of the scaffold and that Sweeting was electrocuted when he simultaneously touched the scaffold and something which was grounded, such as the screwgun.

The identity of the person who placed the wires in contact with the scaffold was strenuously contested. William Truax, Sweeting's co-worker, denied placing them on the cross brace and testified that he did not observe Grover Sweeting doing so either. Tulip denied touching any of the wires on the mezzanine, other than the panel room light loop. Regardless of who placed the wires on the scaffold, there was uncontroverted testimony by Sergeant Maurice Tuohey of the Onondaga County Sheriff's Department that each of three strands of wire taken from the mezzanine floor, including a broken black strand with fused ends, had cracked and deteriorated insulation.

On the issue of damages, plaintiff offered proof that Grover Sweeting's hourly wage in July of 1975 was $4 per hour and that by 1980 he would have been making $5.50 per hour. He was survived by six children, some of whom were the children of his present wife.

Following the charge, the trial court submitted interrogatories to the jury which returned a verdict of $500,000. It found Hoyt 25%, Pearson 65% and Truax & Hovey 10%

responsible, respectively. The jury determined that the owner of the premises for purposes of subdivision 6 of section 241 of the Labor Law was Ballard. The Trial Justice then directed a verdict in the full amount against Ballard, but granted Ballard a judgment over against the three active tort-feasors. The claims against B.O.C.E.S. and Lennox were dismissed. Subsequently, Hoyt was granted a judgment over against Pearson for full indemnification pursuant to an indemnification clause in their contract. From this judgment Pearson and Ballard appeal.

Although there are a number of issues raised, only three require discussion — the application of section 241 of the Labor Law to this accident; whether the contract between Pearson and Hoyt was binding although unsigned at the time of the accident; and the question of ownership of the building.

As of the date of the accident, section 241 of the Labor Law provided insofar as relevant:

"All contractors and owners and their agents * * * when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements * * *

"6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The board may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work shall comply therewith."

After instructing the jury on common-law negligence, the trial court read subdivision 6 of section 241 to the jury and correctly advised them that the statute imposes a nondelegable duty upon owners and contractors to provide reasonable and adequate protection to workers (see *Allen v Cloutier Constr. Corp.*, 44 NY2d 290, 300-301). He then instructed the jury that: "In addition to the statute * * * there are certain regulations which you will use in determining whether or not the Pearson Electric Co. was negli-

gent." Three regulations of the Board of Standards and Appeals were read to the jury which prohibit, respectively, the use of any wiring with cracked or deteriorated insulation; looping of temporary wiring over nails or brackets; and the laying of wire on the ground that is not weatherproof or heavy duty (12 NYCRR 23-1.13 [b] [8], [c] [1] [i], [c] [1] [ii]). Pearson objected to this portion of the charge on the ground that subdivision 6 of section 241 of the Labor Law and the regulations promulgated under it do not apply to subcontractors.

While there is authority for the proposition that subcontractors, as well as general contractors and owners are liable for violation of section 241 of the Labor Law (see *Page v La Buzzetta,* 73 AD2d 483, 484, app dsmd 50 NY2d 1059; *Russin v Picciano & Son,* 78 AD2d 467, 469), it is not supported by the legislative history of the 1969 amendment to section 241 (L 1969, ch 1108, § 3). From 1962 until 1969, section 241 imposed the duty to provide reasonable and adequate protection and safety upon "owners, contractors, and subcontractors". Because experience indicated that owners and contractors were successfully escaping liability by delegating all responsibility for safety practices to subcontractors — who possessed the same duty to workmen as the owners and contractors and exercised supervision and control over the workplace — the Legislature amended the statute in 1969 (see NY Legis Ann, 1969, pp 407-408; see, also, *Allen v Cloutier Constr. Corp., supra,* pp 299-300; *Monroe v City of New York,* 67 AD2d 89, 101-102). In the 1969 amendments, the Legislature restored the pre-1962 preamble, made section 241 applicable to "contractors and owners and their agents," restored the first five subdivisions of the pre-1962 statute, and incorporated the 1962 version of section 241 into the new statute as subdivision 6 (L 1969, ch 1108, § 3). When the 1962 version of section 241 became subdivision 6, however, the Legislature purposefully deleted the word "subcontractors" and made the subdivision applicable to "owners and contractors and their agents for such work" (Labor Law, § 241, subd 6; see NY Legis Ann, 1969, p 407).

This reading of the legislative intent is consistent with *Allen v Cloutier Constr. Corp.* (44 NY2d 290, *supra)* and

*Haimes v New York Tel. Co.* (46 NY2d 132). Further, subcontractors were not intended to be "agents" within the meaning of either section 240 or section 241 *(Rosenbaum v Lefrak Corp.,* 80 AD2d 337). Rather, it appears that the "agents" contemplated by the statute were employees of the owners or general contractors (NY Legis Ann, 1969, p 409).

Here, however, Pearson was not found vicariously liable under section 241, but was considered an active tort-feasor, guilty of common-law negligence and the jury was instructed that violation of the regulations would constitute some evidence of negligence. Since subcontractors were not intended to be liable under section 241, the trial court's charge in this regard would be error, unless Pearson was under an independent duty to comply with the regulations. According to the Official Compilation of Codes, Rules and Regulations of the State of New York, Part 23 of Title 12 (entitled "Protection in Construction, Demolition and Excavation Operations,") was promulgated under the statutory authority of sections 27-a, 28 and 29 of the Labor Law. No mention is made of subdivision 6 of section 241 of the Labor Law, although the regulations clearly track the statutory language and presumably were promulgated under authority of that statute as well (see *Vallina v Wright & Kremers,* 7 AD2d 101, 103-104). In fact, in *Vallina* we specifically held that Part 23 was originally promulgated under concurrent authority of sections 28, 200 and 241 of the Labor Law.

Former section 28 of the Labor Law (repealed on Aug. 9, 1975 [L 1975, ch 756, §§ 10, 27, as amd by L 1975, ch 758, § 2]), in effect on the date of the accident, empowered the Board of Standards and Appeals to promulgate rules to prevent personal injuries in construction (Labor Law, § 28, subd 1, par a). The broad statutory language did not limit the applicability of these rules to owners and general contractors. In the regulations themselves, the Board of Standards and Appeals made Part 23 applicable to *employers* as well as owners, contractors and their agents (12 NYCRR 23-1.3). It has long been the rule that subcontractors, as employers, have a duty to comply with these regulations (see *Vallina v Wright & Kremers, supra,* p 108;

*Komar v Dun & Bradstreet Co.,* 284 App Div 538, 541; see, also, *Wright v Belt Assoc.,* 14 NY2d 129, 134-136 [subcontractor had duty to comply with 12 NYCRR 23.8]; *Cangiano v Lo Bosco & Son,* 23 AD2d 860, 861, affd 18 NY2d 922 [subcontractor responsible for own compliance with rules of Board of Standards & Appeals]). Thus, Pearson had a duty to comply with the regulations and there was no error in so charging.

Next we consider the unsigned contract between Pearson and Hoyt. The Trial Judge ruled that the general contractor, Hoyt, was entitled to full indemnification from Pearson pursuant to section 11.20 of their subcontract. Pearson duly objected to the admission of the subcontract into evidence, and contends on appeal that its terms are not enforceable because it was not drafted or signed until August, 1975.

The record establishes that Pearson commenced work and was paid pursuant to a purchase order dated July 7, 1975, issued by Hoyt to Pearson. The purchase order detailed the work to be done by Pearson and set a contract price of $87,650 for the services. It also contains the following clause in the handwriting of the project manager of Hoyt, who signed the document: "AIA 401 to follow as per your breakdown of values which we need to complete contracts". At trial the project manager testified that in negotiations on the subcontract prior to issuance of the purchase order he and Pearson had agreed that the subcontract would be standard form AIA 401. According to him the only term of the subcontract that remained open was Pearson's cost breakdown, i.e., an itemization of the contract price into direct costs, overhead, and profit that was needed to compute any savings from Pearson's cost estimate which, by agreement, was to be shared with the owner. The subcontract itself was not drafted until after Hoyt received the cost breakdown from Pearson in a letter dated August 5, 1975, and was signed and mailed to Pearson for signature on August 12, 1975. The completed subcontract was received by Hoyt on August 21, 1975.

It is apparent from the face of the subcontract that both parties intended it to have retroactive effect. The subcontract is dated June 18, 1975, and it was agreed that work

was to commence on that date. Defendant Pearson presents no reason for denying the contract retroactive effect. Since contracting parties are free to predate a contract and agree to make it effective retroactively from that date (9 NY Jur, Contracts, § 55), the intent of Hoyt and Pearson Electric should be followed. If the subcontract was effective retroactively to June 18, 1975, then the indemnification clause was binding on the date of the accident which occurred on July 17, 1975.

Although a contract which contains an agreement to agree in the future as to an essential term is considered incomplete and unenforceable *(May Metropolitan Corp. v May Oil Burner Corp.,* 290 NY 260, 264), here, the cost breakdowns, the only terms left open, were not an essential term of the contract. There was no evidence of an express agreement that the existence of the contract was to be contingent on the nature of the cost breakdowns and the total price of the contract was fixed. The contract was, therefore, binding and enforceable even though the cost breakdowns were to be decided in the future. Further, the parties had agreed to use AIA 401, a standard form contract which contains an indemnification clause. There was no evidence of an express agreement that the contract was not to take effect until the writing was drafted and signed. In fact, Pearson's conduct in commencing work and accepting payment suggests that the contract was intended to have immediate effect. Since the oral contract was intended to have immediate effect, and the terms of AIA 401 were incorporated by reference into that oral contract, there was a binding indemnification agreement in effect on the date of the accident.

We turn next to the question of ownership of the B.O.C.E.S. building. The jury determined as a question of fact that of the three parties having a property interest in the B.O.C.E.S. building Ballard was the one who had exercised dominion and control over the work area and thus was the "owner" of the premises for purposes of section 241 of the Labor Law. Ballard objected to that portion of the charge which submitted ownership as a question of fact to the jury, which instructed the jury to

find only one owner and which made ownership contingent on the degree of control exercised by the party.

Section 241 of the Labor Law imposes liability upon "owners" but does not define the term. Looking to the legislative history for guidance, it is immediately apparent that the owner was the party who had the prime contract with the general contractor and who, as titleholder, would receive the benefit of the work and who thus had an interest in completing it. The owner, jointly with the general contractor, would have the right to choose the subcontractor and to co-ordinate and supervise the work. Since the goal of the statute was to protect workmen, vicarious liability was imposed on owners in the hope that they would enforce their right to choose responsible and safety-conscious subcontractors as well as their right to impose safety measures on those subcontractors (see, generally, NY Legis Ann, 1969, pp 407-408).

Here, there are three potential "owners" of the premises — Lennox, the legal titleholder; Ballard, the purchaser of the premises; and B.O.C.E.S., the tenant. Since each of these parties owned a property interest in the building at the time of the accident, each was potentially included within the generic term "owners" (see 3A Warren's Weed, New York Real Property Owner, § 1.02). Ballard, though merely a prospective vendee, was the equitable owner of the premises (see, e.g., *Williams v Haddock,* 145 NY 144, 150; 3A Warren's Weed, New York Real Property, Owner, § 2.02). An equitable owner who otherwise fulfills the attributes of an owner as contemplated by the Legislature may be charged with liability under section 241 of the Labor Law.

The courts rarely have had occasion to consider the meaning of "owners" under section 241 of the Labor Law. The Trial Judge ruled that the "owner" was the party exercising dominion and control over the premises. However, the Court of Appeals announced in *Allen v Cloutier Constr. Corp.* (44 NY2d 290, 300, *supra)* that an owner is liable under section 241 whether or not that owner exercises control or supervision over the subcontractors. Thus, the trial court erred by submitting the question of ownership to the jury as a question of fact, by limiting the jury to

one "owner" and by instructing the jury that ownership turns on control. We conclude that the errors were harmless, however, since the jury determined that Ballard is the owner and this is the correct result as a matter of law.

The "owners" contemplated by the Legislature are those parties with a property interest who hire the general contractor to undertake the construction work on their behalf (see NY Legis Ann, 1969, pp 407-408). It is the party who, as a practical matter, has the right to hire or fire subcontractors and to insist that proper safety practices are followed. It is the *right* to control the work that is significant, *not* the actual exercise or nonexercise of control. The Legislature could not have intended to impose vicarious liability on parties who had no power to choose responsible subcontractors or to influence their safety practices, when the primary purpose of the statute was to protect workers by encouraging owners and general contractors to insist on adherence to safety rules (see *Buonassisi v Sears, Roebuck & Co.*, 43 AD2d 701, 702-703; *Olson v 480 Park Ave. Corp.*, 12 AD2d 960).

In the instant case, Ballard contracted with the general contractor to have the work performed on its behalf. Although Ballard had only an equitable interest in the property, it fulfilled the role of owner. Despite the fact that Lennox was the legal titleholder, it had no contractual relationship with the general contractor or the subcontractors and thus had no power to insist that safety measures be followed. And while B.O.C.E.S. was the lessee of the premises and had negotiated with Ballard to have the construction performed as a condition of the lease, it also had no contractual relationship with Hoyt and no control over safety practices. Ballard, as the only party with a property interest and the right to insist on safety practices was, therefore, the "owner" for purposes of section 241 of the Labor Law.

■ ■ Finally, we make brief comment on the several other issues raised. We see no error in the court charging the jury as to the safety standards set forth in the National Electric Code (see *Bailey v Baker's Air Force Gas Corp.*, 50 AD2d 129, 132, mot for lv to app den 39 NY2d 708; cf. Ann., 58 ALR3d 148, 154-155; Comment, Admissibility of Safety

Codes, Rules and Standards in Negligence Cases, 37 Tenn L Rev 581). That the Code was not in evidence was due to Pearson's trial strategy from which it may not now benefit. The portion of the trial court's charge relating to circumstantial evidence and contributory negligence was adequate — and, with respect to the latter no exception or request was taken or made to the charge as given. Portions of the deposition of the president of Hoyt were properly excluded not only as hearsay, but because no proper foundation was laid. Similarly, a contract between B.O.C.E.S. and an architectural firm was properly excluded as irrelevant to any material issue in the case. Further, B.O.C.E.S. was not bound to indemnify Ballard for the July, 1975, incident under the terms of its nonretroactive lease which did not take effect until September 1, 1975. On the last issue raised, we concluded that the jury's verdict in this wrongful death case was not so excessive as to shock the conscience of the court.

For all these reasons the judgment should be affirmed.

DILLON, P.J., CALLAHAN, MOULE and SCHNEPP, JJ., concur; CARDAMONE, J., not participating.

Judgments affirmed, without costs.